RICKMAN MANUFACTURING COMPANY, INC., v. L. P. GABLE AND WIFE, EMMA BROOKS GABLE.

(Filed 10 April, 1957.)

**1. Trial § 22a—**

On motion to nonsuit, the evidence must be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. G.S. 1-183.

**2. Landlord and Tenant § 7—**

A lease of premises includes all easements and privileges appurtenant to the demised premises which are reasonably necessary to its enjoyment, and parol evidence is competent to show the meaning of the term "appurtenances" as used in the lease contract.

**3. Same—**

The owner of a three-story building leased the second and third floors to plaintiff and the first floor to other tenants, with provision in the leases, respectively, that the lessee of the second and third floors should be responsible for two-thirds of the maintenance and upkeep of the heating plant and for two-thirds the fuel costs, etc., and the tenants of the first floor should be liable for one-third thereof. *Held:* The heating system in the basement is an appurtenance to the leased premises and is included in the property leased.

**4. Landlord and Tenant § 10—**

Provision in a lease that lessee should be responsible for the maintenance and upkeep of the heating plant in the building demised, is equivalent to a general covenant to repair the heating plant.

**5. Landlord and Tenant § 11—**

Where the lessee is responsible for the maintenance, upkeep and repair of the heating plant in the building, the lessor may not be held liable for damages caused by an explosion in the heating plant when the evidence shows that the explosion was the result of improper maintenance and not the manner of the installation of the equipment itself.

**6. Landlord and Tenant § 8—**

A lessee in possession under the terms of the lease is entitled to hold possession and control against the world, and the landlord has no right to enter upon the leased premises against the consent of the tenant.

**7. Same: Landlord and Tenant § 7—**

Where a lease for a term of five years is in writing as required by statute, G.S. 22-2, oral statement of the lessor's son-in-law forbidding lessee to have anything to do with the furnace, an appurtenance of the demised premises, cannot have the effect of modifying the written lease, certainly in the absence of evidence that the son-in-law had legal authority as agent of the lessor to agree or assent to a change in the written lease.

APPEAL by plaintiff from *Armstrong, J.,* at October 1955 Regular Term of ROWAN, being No. 530 at Spring Term 1956 and carried forward to present No. 522.

The case on appeal contains these recitations: This is a civil action instituted by the plaintiff to recover damages allegedly resulting from a boiler explosion proximately caused by the negligence of the defendants.

Plaintiff is a tenant occupying the second and third floors of a building belonging to the defendants. The boiler which exploded is located in the basement of said building.

The plaintiff contends that the boiler and boiler room were no part of the leased premises and were under the control of the defendants.

The defendants contend that the boiler and boiler room were part of the leased premises and under the control of the plaintiff.

The record of case on appeal discloses that: On 21 June, 1951, defendants, L. P. Gable and wife, Emma Brooks Gable, of Anderson, South Carolina, as parties of the first part, entered into a written agreement with plaintiffs, Rickman Manufacturing Company, Inc., and Mary Rickman, individually, of Rowan County, North Carolina, parties of the second part, Exhibit U reading in pertinent part as follows:

"That for and in consideration of the agreements and covenants hereinafter to be fulfilled by the parties of the second part, the parties of the first part do hereby lease unto the parties of the second part, their heirs, successors and assigns, for a period of five (5) years, commencing September 1, 1951, the following described property: The second and third floors of the garage building located at the southwest corner of

the intersection of North Main and West Liberty Street, Salisbury, N. C., known as the Rouzer Building.

"To HAVE AND TO HOLD the same, with the privileges and appurtenances thereunto in anywise appertaining, to the said parties of the second part, their heirs, successors and assigns, for the above period, upon the following terms and conditions:

" '1. The rental for said term shall be (as set forth).

" '2. This lease is subject to the rights and privileges granted to Carolina Tire Company, Inc., Brad Ragan Motor Company, Inc., and Brad Ragan, individually, for the use of the entrance from Liberty Street, approximately twenty-four feet wide, for the common use of the parties of the second part and Carolina Tire Company, Inc., Brad Ragan Motor Company, Inc., and Brad Ragan, individually, as set forth in their lease, for the purpose of loading and unloading, ingress, egress and regress only, said entrance not to be used for storage or parking by either of the tenants.

" '3. It is further understood and agreed that the parties of the second part, their heirs, successors and assigns, shall be responsible for two-thirds of the maintenance and upkeep of the heating plant and equipment in said building; shall pay two-thirds of the fuel costs; shall pay two-thirds of the expense of water for said building; shall pay all of the expense for maintenance of plumbing and plumbing fixtures on the second floor of said building, together with the upkeep thereof, so that same will be in as good condition at the expiration of this lease as it is on this date.

" '4. It is further understood and agreed that the parties of the second part, their heirs, successors and assigns, shall be responsible for all electrical fixtures for their portion of the building, to have a separate meter for the same, and to make such electrical installations therefor for their own operations, at their own expense . . .' "

And paragraphs 5, 6, 7, 8 and 9 of the lease set forth matters which the parties of the second part, their heirs, successors and assigns, may or may not do, and matters for which they are responsible in relation to the demised premises not here pertinent.

And the next paragraph reads as follows: "10. It is further understood that the parties of the first part are to maintain the roof on said building at their own expense."

And paragraphs 11 and 12 pertain to options for renewals.

Paragraphs 13, 14 and 15 pertain to agreements on part of parties of second part in respect to public liability insurance, etc. And the final paragraph reads: "16. It is further understood and agreed that if the above mentioned building should be destroyed or rendered unfit for use by fire or other casualty during the term of this lease, the same

shall thereupon terminate." Then follows formal closing, and signatures, acknowledgment, probate and entries of registration.

The record of case on appeal also shows that upon cross-examination, plaintiff Mrs. Mary Rickman testified that the lease which Mr. Brad Ragan and the Carolina Tire & Rubber Company entered into which bore the same date as her lease, provides that Brad Ragan Motor Company and the Carolina Tire Company were to assume responsibility for one-third of the maintenance of the heating plant and the cost of fuel.

The record of case on appeal also discloses that:

I. Upon pre-trial hearing an order was entered by the presiding judge. In it it is set forth that "from the pleadings this appears to be an action by plaintiff tenant under a written lease against defendant, the landlord, under said lease, to recover $55,555.07 alleged damages contended to have been suffered by plaintiff on account of the negligence of defendants in maintaining the heating plant in the premises covered by the lease. Plaintiff sets forth in its complaint the negligence complained of, which is denied by the defendants, who in turn plead contributory negligence and also set up a counterclaim against the plaintiff for damages to the leased premises on account of the alleged negligence of the plaintiff. If the plaintiff has stated a cause of action, which the court doubts, it is fairly certain that the defendants have not. Defendants, through counsel, admit that they do not have a cause of action against the plaintiff until the termination of the lease."

And in the order so entered "It is judicially stipulated by all the parties to this action as follows:

"1. That the Rickman Manufacturing Company is a corporation duly incorporated under the laws of the State of North Carolina, with its principal office and place of business in the city of Salisbury, Rowan County, North Carolina, and engaged in the manufacture and sale of cotton goods for wear, etc.

"2. . . . that the defendants own the *locus in quo* as an estate by the entirety.

"3. Plaintiff admits the lease of Rickman Manufacturing Company.

"4. Photographs identified.

"5. It is admitted that Hayden Clement, attorney for Rickman Manufacturing Company, wrote certain letters to L. P. Gable and wife, Emma Brooks Gable, one dated October 24, 1952, one November 24, 1952, and one dated December 18, 1952, and that they were received by the defendant. It is admitted that the letter dated November 17, 1951, to L. P. Gable, Anderson, S. C., was signed by Hayden Clement and was addressed to and received by L. P. Gable.

"It is admitted by defendants, through their counsel, that the following copies of documents may be admitted in evidence instead of the

original provided they are adjudged competent at the trial: Exhibits marked G, H, I and J.

"Original letter dated November 11, 1952, addressed to Ramsey Realty Company, Exhibit K. Letter to L. P. Gable and wife, signed by Hayden Clement, Exhibit L."

"It is stipulated that plaintiff's Exhibit M is a true and correct copy of an original letter mailed March 4, 1952, from the Chief Inspector of Hartford Steam Boiler Inspection and Insurance Company to L. P. and Mrs. Emma B. Gable, and that a copy of this letter was transmitted to Rickman Manufacturing Company by Ramsey Real Estate & Insurance Company by letter dated March 7, 1952."

II. Upon the trial in Superior Court plaintiff offered in evidence these admissions from answer of defendant: ". . . that the defendants, L. P. Gable and wife, Emma Brooks Gable, are citizens and residents of the City of Anderson, State of South Carolina, and that said defendants are and were the owners of the buildings referred to in the complaint in this action . . ."

"That the said Ramsey Realty & Insurance Company did at all times herein alleged collect rentals for defendants on the aforesaid real estate of defendants in Salisbury, North Carolina, and at all times alleged herein was the agent of the defendants in the City of Salisbury, North Carolina, with respect to the collection of said rentals from said properties."

". . . That subsequent to the explosion referred to in the complaint plaintiff's attorney addressed letters to the defendants dated October 24, 1952 and November 24, 1952, with reference to the heating plant of said building and that heating contractors and engineers inspected said heating plant."

". . . That on October 24, 1952, the attorney for plaintiff addressed a letter to the defendant, a copy of which is attached to the complaint and marked Exhibit A; that a letter was also addressed to the defendant by the attorney for plaintiff on November 24, 1952, a copy of which letter is attached to the complaint and marked Exhibit B."

Exhibit A so addressed to defendants reads in pertinent part: "You are hereby notified to forthwith . . . replace or satisfactorily repair the furnace in the premises we are leasing from you at the southwest corner of the intersection of North Main Street and West Liberty Street in order that we may not be further damaged. It is absolutely necessary that we have heat in order to carry on our regular business in the premises . . ."

The plaintiff, Mrs. Mary Rickman, also testified in pertinent part: ". . . I am the President of the Rickman Manufacturing Company . . . a corporation, doing business at 232 N. Main, the second and third floors, on the corner of Liberty and Main Streets of Salisbury

. . . I moved to the property owned by L. P. Gable and wife, Emma Brooks Gable, the last of August 1948. At that time I sublet the premises from Ullman Company, New York . . .

"About the 21st day of June, 1951, I entered into a lease with L. P. Gable and wife, Emma Brooks Gable. I never had any conversation with Mr. or Mrs. Gable with reference to the lease; I have never seen them in my life; I negotiated the lease with Mr. J. B. Wall. The lease was drawn up by Lawyer Hudson, representing L. P. Gable and J. B. Wall. Mr. Wall was with him. The negotiations were conducted in Mr. Clement's law office. Present were Mr. Brad Ragan, Mr. Wall, Mr. Hudson, Mr. Clement and myself. Mr. Ragan represented the Carolina Tire and Rubber Company. The Carolina Tire & Rubber Company occupied the first floor. I was to occupy the second and third floors.

"Mr. J. B. Wall and Mr. Hudson negotiated the terms of the lease with me. They were representing the Gables. Mr. Wall told me that he wanted me to pay the rental on the two top floors and he leased the first floor to the Carolina Tire & Rubber Company and Mr. Ragan. He gave us the price of $605.00 per month for the two top floors for five years, with option of five more, and he also said I should pay two-thirds of the heat, two-thirds of the water, and the Carolina Tire & Rubber Company was to pay a third of each for the first floor . . . I signed the lease as President of Rickman Manufacturing Company and individually. It was also signed, as I understand, by L. P. Gable and wife."

And the witness, Mrs. Rickman, continues: "Along in September 1951, after the lease had been signed, Mr. Wall came into my plant, had some men with him, said he was going to look about the furnace and look about the heating system of the plant. He went all over the two top floors and he was downstairs a number of days . . . I didn't follow him, but I did tell him not to turn my radiators open that we had closed, that they would leak and he said all right. I left to go away that afternoon and when I came back on Saturday morning, the second floor had water all over the floor where I had finished merchandise . . . and the water had got in among the boxes, and the boxes had toppled over and all the merchandise had fallen into the water and were damaged."

Plaintiff here offered in evidence the official tax list of Rowan County for the years 1951 and 1952, the listing of property belonging to L. P. Gable and wife at the corner of Main and Liberty Streets,—the tax scrolls being signed by J. B. Wall, Agent—Exhibits N and O.

And the witness, Mrs. Rickman, continued: "After I discovered that my goods and materials were damaged by water in the building . . . I had Mr. Clement write a letter to Mr. and Mrs. Gable—Exhibit

G— . . . dated November 17, 1951 . . . is the letter. My attorney wrote at my request. In consequence of that letter, I later signed a release in February 1952, running to L. P. Gable and wife, Emma Brooks Gable, and J. B. Wall upon receiving payment from them for the damages to these goods. At the time I signed that release, I made a statement showing the damages to my goods to Ramsey Realty & Insurance Company."

The witness, Mrs. Rickman, further testified: "After this release was executed and delivered by me, Mr. Wall came and told me that after he paid the damages on the goods that he forbid me to go down to the basement or any place to mess with the furnace, or any of my employees, and I told him I had never been in the basement and never intended to go, and that he said he would look after it and take care of it. From then on I did not authorize any of my employees to go down and look at the furnace. I told them to stay out and leave it alone, that we had been forbidden to go down there and I didn't want to have anything to do with it. Mr. Wall said he would look after it himself. He said he had already spent $100.00 on it and I didn't appreciate it . . . He said he had been working on it. From that time on, in consequence of what Mr. Wall said, I did not at any time authorize or instruct any of my employees to work on this boiler."

And the witness, Mrs. Rickman, continued: "On the 21st day of October, 1952, the day that the boiler exploded, I was late coming to work that morning . . . and I was coming to the first floor in the Carolina Tire & Rubber Company and the whole building was full of smoke, and I asked them what was wrong. They said they didn't know, that it was down in the boiler room, something happened to the boiler . . . I called the fire department and told them to come down and see what was wrong. They came down . . . four firemen . . . and two came upstairs after they went down and told me they were condemning the boiler and not to mess with it at all. I walked in my office and called my lawyer, and told him the news. I told my employees standing around to be sure not to go down there or near it and to stay away from it, that it has been condemned and it might blow up. I met Mr. Clement at Mr. Ramsey's office . . . we asked Ramsey to please do something about the boiler that it was going to blow up or something, that the city had condemned it, and I needed heat for my employees, that it was real cold. Mr. Ramsey took out a piece of paper and started writing down the complaints and said 'I will have to get hold of Mr. Wall. I don't know whether he is in town now or not.' Just about that time the fire department and firemen went down the street, and drove off . . . and I ran off . . . and went back to the place. The boiler exploded . . . one explosion before I got to the corner, and I heard three after I got down there . . . After that I had

my attorney write Mr. Gable and his wife a letter to immediately replace or repair the furnace in order that we might have heat to carry on the business of the company. I did not receive any reply to that letter, and in consequence of my failure to receive a reply, on November 24, 1952, I had my attorney again write a letter to Mr. and Mrs. Gable regarding the damage to my property . . . 'Exhibit L.' I did not receive any reply to that letter . . . until December 8, 1952, when I had heat installed on the second and third floors, it was so cold my help could not work . . . I bought gas heaters . . . The cost of installation of those gas heaters was $2,267.59 . . . By reason of the explosion, and the smoke therefrom, my goods were damaged."

And the witness, Mrs. Rickman, testified: "I was furnished a copy of 'Report of Inspection' of the boilers made on March 4, 1952, the original to L. P. and Emma B. Gable," marked plaintiff's Exhibit M, offered in evidence, reading as follows:

"THE HARTFORD STEAM BOILER
INSPECTION AND INSURANCE COMPANY
Hartford, Connecticut

ATLANTA OFFICE
1325 Citizens & Southern Nat'l Bank Bldg.
Atlanta 3, Georgia

March 4, 1952

REPORT OF INSPECTION

Date of Inspection—February 28, 1952        Inspector—J. T. Cuneo
Location—232-36 North Main Street
Salisbury, North Carolina

F. B. Boiler No. 1
Inspected externally while in service

"The boiler was being operated with one fire door open, which we understand is necessary under present conditions to avoid flare-backs. The trouble is apparently due to the boiler room being tight with no provision for ventilation and, therefore, insufficient oxygen for proper combustion. An adequate size ventilation opening should be provided in one of the boiler room walls or doors.

"Inspection of other insured equipment disclosed no conditions that require attention at this time.

Yours very truly
Chief Inspector.

To: L. P. and Mrs. Emma B. Gable
    Anderson, South Carolina."

Then on cross-examination the witness, Mrs. Rickman, testified: "I identify a paper writing handed to me as a lease entered into by and between Bernhart-Ullman Company, Inc., and Rickman Manufacturing Company, Inc., with my signature immediately at the bottom of the lease . . . I took possession of the top floor of the premises in question as a result of that lease . . . the date of that lease is August 24, 1948. I was still a tenant under the terms of the lease with Bernhart-Ullman Company on the date on which the lease with Mr. and Mrs. Gable was executed. This one expired August 31, 1951, but the other one didn't take effect until September 1, 1951. I actually executed the lease in June and it didn't become effective until the day after this one expired."

Then over objection and exception by appellant, the witness was asked this question: "Q. I ask you to look at paragraph 7, page 3 of this prior lease, and I ask you if that paragraph is not in these words: '7. The Landlord warrants that the heating equipment in the premises of which the premises hereby let are a part, is in good working order and sufficient to adequately heat the entire building. The Tenant agrees that it will operate the said heating plant at its own expense during such weather as requires heating of the premises and will, if the Landlord should rent the first and second floors of the building, operate the heating facilities for said first and second floors during the normal one-shift factory working hours, provided the said occupant or occupants shall, at the end of each and every month, pay to the Tenant their proportionate share of the cost of operation of the heating plant, said cost to include but not be limited to: (1) Cost of fuel—(2) Cost of repairs—(3) Cost of operating, personnel—(4) Proper insurance coverage. A "proportionate share" shall mean, in each instance, one-third ($\frac{1}{3}$) of the total costs as to each floor so occupied.

"It is specifically understood that the Tenant assumes no responsibility in furnishing the said heat to the said Tenants of the first and second floors, and the Tenant shall not be liable under any circumstances whatsoever for failure or cessation of heat because of or attributable to any breakdown of equipment, lack of fuel, operating personnel or for any cause beyond the control of the Tenant, it being the express understanding that the Tenant undertakes to supply only such heat to the tenants of the first and second floors, as and when and to the extent same is available out of the capacity of the plant.' " Exception No. 1. "A. Yes, sir."

And the witness, Mary Rickman, identified copy of the lease from L. P. Gable and wife, Emma Brooks Gable, and Rickman Manufacturing Company, dated June 21, 1951.

The witness continued: "After I entered into possession under this lease between myself and Mr. and Mrs. Gable, I billed Brad Ragan

Company for one-third of fuel used in the operation of the plant. I billed them for no other expense. I only billed them for one-third of the fuel oil. This bill dated June 9, 1952, from the Rickman Manufacturing Company for one-third of repairs on motor for boiler downstairs was on a pump that kept water out of the basement, didn't have anything pertaining to the boiler at all; so that the water wouldn't get up in the basement. I have never been down in the basement and don't know whether the pump was located immediately in front of this equipment."

And the witness continued: "I had in my employ on or about October 21, 1952, a man by the name of W. Howard Williams. He was not the man that looked after this equipment. I had no one to look after the equipment after I took the lease over for Mr. Wall. I was only to pay two-thirds of the amount of the bill. I wasn't supposed to look after it.

"I know a man by the name of W. D. Perkins. Mr. Perkins looked after this boiler as long as I was in possession under the first lease. He took care of it for me because Mr. Bernard told me it was a dangerous boiler, and he told me he would get Mr. Perkins. He looked after it. Mr. Wall looked after it after that. I did not pay the bills to anyone; no bills came in."

Then she was asked this question: "In other words, it wasn't maintained?", to which she answered: "Must have been, I never got any bills."

Then the witness, Mrs. Rickman, continued: "I built a wall in that building when I first took over the second floor. The exact date I don't know. It was to block the stairway off from the outside because the downstairs was not rented and anyone could get into my place of business. I put up a concrete wall. I built that wall along the stairway that led down into the basement. I don't recall exactly when I took over the second floor. It was prior to the time I entered into this last lease."

Then on continuation of cross-examination these questions were asked to which she answered as indicated: "Q. I hand you a letter dated March 7, 1952 from the Ramsey Realty & Insurance Company and ask you if that is the letter which accompanied this report which you have offered as your Exhibit M in evidence?" Plaintiff objects— Overruled—Exception No. 2. "A. Yes sir." "Q. This letter which is identified as defendants' Exhibit 14, I ask you if it doesn't read as follows:

"March 7, 1952

Mrs. Mary Rickman
Rickman Manufacturing Company
Corner Liberty and Main Streets
Salisbury, N. C.

Dear Mrs. Rickman:

Attached please find a copy of a letter received from the Hartford Steam Boiler Inspection and Ins. Co., Hartford, Conn.

I will appreciate your attention in having this defect corrected so the inspection will pass. I believe the wall you had put up on the first floor is causing this trouble.

Yours very truly
· RAMSEY REALTY & INSURANCE CO.
(s)   R. E. Ramsey

RER/b
Enclosure."

Plaintiff objects—Overruled—Exception No. 3.  "A. Yes sir."

"This report from the Hartford Steam Boiler Inspection Insurance Company, dated March 4, 1952, is the copy which was attached to it. I am still in possession of the two floors.

"Q. And you are in possession under the terms of the lease which is dated June 21, 1951?  A. Yes."

And on re-direct examination the witness said: "When I received that letter dated March 7, 1952, from the Ramsey Realty & Insurance Company agent, that was after I had been notified by J. B. Wall not to touch that furnace or to have anything to do with it . . ."

Plaintiff's witness Morton Penn testified in pertinent part: "I am Vice-President and Secretary of the Rickman Manufacturing Company. I was there the day of the explosion . . . We . . . called the fire department . . . one of the firemen told us he didn't want us to start it. Mrs. Rickman had told all the employees and everybody that they were not to touch the apparatus that would start the thing off . . ."

Mrs. Ruby Farrington, as witness for plaintiff, testified in pertinent part: "I work for Rickman Manufacturing Company . . . I recall the morning of the explosion that occurred October 21, 1952 . . . Mrs. Rickman called the fire department . . . two went up to her office. I saw several of them on the ground floor. I overheard a conversation between Mrs. Rickman and Howard Williams that morning. It was on the ground floor and she started out and turned around and said 'Don't bother the furnace any more. I will go to Lawyer Clement and see if he can't get us some heat.' She told this to all the employees

standing around there, Florine Trexler, and Mr. Penn and Howard Williams. As I remember, after the firemen left, I was standing there and I heard someone say: 'Go ahead and light it and see what happens.' I guess they were talking to Howard Williams. Two firemen, Howard and myself were standing to the side . . . one of the two firemen told Howard about it—told him to go ahead and light it and see what would happen before they returned. I went up the steps at that time—all the way to the third floor . . . The explosion took place approximately five or ten minutes after that conversation . . . I came running out and I said 'I will go and see Howard.' I got to the second floor and met Howard and he was burnt black."

The witness Gaither Cloer testified: "I have been employed by the Rickman Manufacturing Company approximately eight years . . . After this lease was signed on the 21st of June, 1951, I saw Mr. J. B. Wall making repairs to radiators. I did not see him around the boiler. I remember when the water damage was done. He was not there at that time, but he was there before . . . The radiators were opened up and the water damaged some goods and he brought a man with him . . . and went around and examined all the radiators and marked 'X' on all them that were leaking. I don't recall what year that was. Mr. Wall made this statement to me. He said not to mess with them any more; all of them that had 'X' on them were out of fix, leaking . . . that was mostly on the second floor . . . On the morning of the explosion . . . we discovered some smoke coming from the boiler, and me and Mr. Williams went . . . and I put a rag on my face and went to the boiler room and pulled the switch for safety. That would throw it off . . . The only time I had been in the boiler room since January 1951 until the time I cut off the switch was when Mr. Perkins would be there. It always gave trouble in 1950 and 1951. After Mr. Perkins stopped working on the boiler I did not go there."

Plaintiff also introduced as a witness one James E. Hart, consulting engineer, tendered and admitted to be an expert, who on direct examination testified in pertinent part: ". . . I looked at the installation in Salisbury the day after the accident happened . . . I examined and found that there had been an explosion, at least one, and from what I could see the plant was rather poorly maintained; everything was dirty, a general dirty state, which indicated a lack of care. With all oil burners of this type frequent cleaning and adjusting is necessary. If such adjustment is not done almost weekly, trouble can start in a mild way, and if nothing is done to cure that you may have serious trouble later, like occurred on this job. The failure of this equipment, as best I could determine, was due to dirty oil cups which prevented the oil from atomizing properly and dropped liquid oil down in the bottom of the furnace, so that when ignition took place they went off in explosion

rather than ordinary flame ignition. In so doing, it blew the smoke door open and blew the burner out of the boiler and swung it out on its hinges. I believe there were subsequent explosions and they could have been caused from the first one, made a related series of explosions, but in my opinion the whole business was caused by negligence in not keeping the burner adjusted properly and cleaned properly. I base the opinion just expressed upon a visual examination the day after it happened. The whole job was in a rusty and dirty condition, rusty and just not clean; coal dust around the installation, and it had not been fired with coal for some time.

"In my opinion the explosion was caused by one thing and that was the presence of liquid oil, fuel, in the furnace in more quantity than it would normally burn. That liquid oil fuel could be accumulated from different sources. There could be only one reason for the explosion, and that is liquid fuel. Any condition that would have cause(d) that liquid fuel to accumulate would be due to negligence . . .

"I said three things that could cause the presence of liquid oil being in the pit of the furnace: First, a dirty cup which would not atomize it properly; the second, failure of the controls to cycle the burner; the third is the poor adjustment on the fuel air ratio. I could not tell from the examination afterwards which one of those caused the explosion. I would assume that all three, or any one of the three, was caused by negligent maintenance because if they are periodically cleaned they won't do so. I mean by negligence that you don't have a man look at it once a year. You clean the cup once a week or once a day."

Then the witness, under cross-examination, continued: "This was the Kiwanee air burner. From my examination of this equipment on the particular time that I saw it, I did not see any portion of the boiler or the oil burner which was mechanically defective in itself. In my opinion, as I have testified, the only reason that this burner exploded was because it had not been properly maintained. And in the proper maintenance of such equipment, it should be cared for daily, actually, and certainly at least once a week. In my opinion from the conditions existing there at the time of my examination, proper care had not been used in the maintenance of that boiler, because it was dirty. I believe that this boiler and the oil burning unit which was attached to it were equipped with modern and approved controls. As far as the installation of the equipment itself was concerned, it was done in a, shall we say, usual method . . ."

On re-cross-examination the witness concluded with this statement: "I get back to the same thing, the lack of maintenance, in my opinion."

Plaintiff offered other testimony relating in the main to matters of damage.

And the plaintiff having so introduced its evidence and rested its case, motion of defendants for judgment as of nonsuit was allowed. From judgment in accordance therewith plaintiff appeals to Supreme Court and assigns error.

*Clarence Kluttz, Lewis P. Hamlin, Jr., W. T. Shuford, and Hayden Clement for Plaintiff Appellant.*

*Hartsell & Hartsell, William L. Mills, Jr., Hudson & Hudson, and Woodson & Woodson for Defendant Appellees.*

WINBORNE, C. J.   The principal assignment of error presented on this appeal challenges the correctness of the ruling of the trial court in granting motion for judgment as of nonsuit.   G.S. 1-183.   On such motion the evidence is to be taken in the light most favorable to the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.   The rule is so well recognized in this State that citation of authority is unnecessary.

When the evidence in case in hand is so taken, this Court holds that judgment as of nonsuit was properly entered.

Here, to summarize, there is a five-year lease of real property, required by law to be in writing and signed by the party to be charged therewith.   G.S. 22-2.   By its terms defendants, as parties of the first part, leased to plaintiff, as party of the second part, their heirs, successors and assigns, for a period of five (5) years, commencing September 1, 1951, the following described property: "The second and third floors . . . of the Rouzer building.   To Have and To Hold the same, with the privilege and appurtenances thereunto in any wise appertaining, to the said parties of the second part, their heirs, successors and assigns for the above period" upon terms and conditions stated.

At the same time and on similar terms and conditions defendants leased to Carolina Tire & Rubber Company and Brad Ragan the first floor of the Rouzer building.

And evidence offered by plaintiff as stated in letter to defendants from plaintiff company by its attorney dated October 24, 1952, tends to show that "it is absolutely necessary" that "we have heat" in the building "in order to carry on our regular business in the premises"; and that the source of supplying heat was an oil furnace in the basement of the building.

Therefore the question arises as to whether the heating system in the basement is an appurtenance to the lease of the second and third floors, and hence within the provisions of the lease.   Plaintiff contends that it is not so included in the lease, and defendants contend that it is.

In this connection "It is a settled principle of the law of property that a conveyance of land, in the absence of anything in the deed indicating a contrary intention, carries with it everything properly appurtenant to, that is, essential or reasonably necessary to the full beneficial use and enjoyment of the property conveyed, and this principle is equally applicable to a lease of premises. In leases, as in deeds, 'appurtenance' has a technical signification, and is employed for the purpose of including any easements or servitudes used or enjoyed with the demised premises. When the term is thus used, in order to constitute an appurtenance, there must exist a propriety of relation between the principal or dominant subject and the accessory or adjunct, which is to be ascertained by considering whether they so agree in nature and quality as to be capable of union without incongruity. Moreover as in the case of conveyances, whatever easements and privileges legally appertain to the demised premises and are reasonably necessary to its enjoyment ordinarily pass by a lease of the premises without any additional words. Parol evidence is admissible to show the meaning of the term 'appurtenances.'" 32 Am. Jur., Landlord and Tenant Section 169.

"An 'appurtenance' has been defined as 'a thing which belongs to another thing as principal, and which passes as incident to the principal thing.' It must have such relation to the principal thing as to be capable of use in connection therewith." 4 C.J. 1467, quoted in *Foil v. Drainage Comrs.*, 192 N.C. 652, 135 S.E. 781.

In *Riddle v. Littlefield*, 53 N.H. 503, 16 Am. Rep. 388, this headnote epitomizes the opinion of the Court: "By the lease of a building, everything which belongs to it, or is used with it, and which is reasonably essential to its enjoyment, passes as incident to the principal thing and as a part of it, unless especially reserved."

And in *Stevens v. Taylor*, 97 N.Y.S. 925, 111 App. Div. 561, it is held that "Where certain floors of a building were leased with the 'appurtenances,' a furnace, constituting the only means for heating the leased premises, was included in the word 'appurtenances.'"

So in the case in hand this Court holds that the second and third floors having been leased "with privilege and appurtenances thereunto in any wise appertaining," the furnace, constituting the only means for heating the leased premises, was included in the words "appurtenances thereunto in any wise appertaining."

Moreover, among the terms of the lease, paragraph 3 declares that it is understood and agreed that the parties of the second part, their heirs, successors and assigns, shall be responsible for two-thirds of the maintenance and upkeep of the heating plant and equipment in said building. And the testimony by *feme* plaintiff tends to show that the lease which Brad Ragan and Carolina Tire & Rubber Company entered

into, as above recited, provided that the Brad Ragan Motor Company and the Carolina Tire & Rubber Company were to assume responsibility for one-third of the maintenance of the heating plant and the cost of fuel.

The word "maintenance" is defined in Black's Law Dictionary as "the upkeep, or preserving the condition of the property to be operated."

Indeed in *Chambers v. North River Line*, 179 N.C. 199, 102 S.E. 198, this Court in opinion by *Clark, C. J.*, held that the lessee's covenant to maintain the lease premises in its present condition is equivalent to a general covenant to repair and leave in repair under the common law.

The appellant contends, however, that the language used here means that the parties of the second part shall only pay for two-thirds of the maintenance and upkeep. But it will be seen that the agreement in paragraph 3 is that the parties of the second part, their heirs, successors and assigns, shall do four things: (1) Shall be responsible for two-thirds of the maintenance and upkeep of the heating plant and equipment in said building; (2) shall pay two-thirds of the fuel costs; (3) shall pay two-thirds of the expense of water for said building; and (4) shall pay all of the expense of maintenance of plumbing and plumbing fixtures on the second floor of said building. When read in the light of the fact that Brad Ragan Motor Company and Carolina Tire & Rubber Company were at the same time agreeing to be responsible for the other one-third, the language used is clear. Too, it is significant that of the sixteen paragraphs devoted to stating terms and conditions of the lease, the only obligation imposed upon the parties of the first part is that they "are to maintain the roof on said building at their own expense."

Hence it is patent that plaintiffs, as parties of the second part, agreed to be responsible for maintenance and upkeep of the heating plant.

And the expert witness offered by plaintiff testified that he did not see any portion of the boiler or oil burner which was mechanically defective in itself. He gave it as his opinion that the only reason that this burner exploded was because it had not been properly maintained; that he believed that the boiler and oil burning unit were equipped with modern and approved controls, and that as far as the installations of equipment itself was concerned, it was done in a usual method.

However plaintiff contends that J. B. Wall, son-in-law of defendants, after September 1, 1951, orally forbade them having anything to do with the furnace. Even so, plaintiff was in possession under the lease, and entitled to hold possession and control against the world. The landlord had no right to enter upon the leased premises against the consent of the tenant. *S. v. Piper*, 89 N.C. 551. A tenant can bring trespass against his landlord for forcibly entering and breaking the

close during the term. *Barneycastle v. Walker,* 92 N.C. 198. See also *S. v. Boyce,* 109 N.C. 739, 14 S.E. 98; *S. v. Fender,* 125 N.C. 649, 34 S.E. 448.

Indeed, the case on appeal is devoid of competent evidence as to J. B. Wall having authority to agree, or to assent to a change in the language of the written word, that is, the written lease of real property for more than three years required to be in writing. G.S. 22-2.

Other assignments of error based upon matter elicited upon cross-examination of *feme* plaintiff have been considered, and in the light of the decision reached as hereinabove set forth, prejudicial error is not made to appear.

Hence the judgment from which appeal is taken is
Affirmed.